**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ADELA MENDOZA** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  24-2536** |
| | : | |
| **DIETZ & WATSON, INC.** | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                                 **February 18, 2026**

Dietz & Watson terminated Adela Mendoza, and she sued.  Ms. Mendoza, a homosexual

woman, alleges that her supervisor, Sandor Istvan, created a hostile work environment by

making homophobic comments in the workplace.  Ms. Mendoza says that when she complained

about Mr. Istvan's homophobic remarks, Dietz retaliated against her and discriminated against

her on the basis of her sexual orientation by firing her.  According to Ms. Mendoza, the reason

for her termination — her conceded insubordination in the workplace — was pretextual.  We

disagree.  The record evidence advanced by Ms. Mendoza to forestall summary judgment is too

thin to support a reasonable jury's verdict, so we grant Dietz's motion for summary judgment on

all claims.

### I.    Background

Adela Mendoza applied for a position as a production employee at Dietz & Watson — a

distributor of meats and cheeses — in December of 2015.[1]  DI 22-2 at ¶¶ 1-2.  Ms. Mendoza's

---

[1] Where undisputed, we cite to Ms. Mendoza's response to Dietz's statement of undisputed material facts.  DI 22-2.  Throughout her response, Ms. Mendoza repeatedly "disputes" facts in name, but not in substance.  For example, she disputes Dietz's statement that Ms. Mendoza applied for a position on first, second, or third shift because Ms. Mendoza testified that she applied for first or second shift but also checked a box on her application indicating her willingness to work any shift.  *Id.* at ¶ 2(a).  Where a fact is only nominally disputed, we cite it as if undisputed.

application expressed a willingness to work on first, second, or third shift, and to work overtime hours if necessary. *Id.* at ¶¶ 2-3. On January 4, 2016, Ms. Mendoza was hired as a first shift production employee. *Id.* at ¶ 4. Her typical work hours were from 6:30 AM to 3:30 PM. *Id.* As a condition of her employment with Dietz, Ms. Mendoza joined United Food and Commercial Workers International Union Local 152 (Local 152), under which she was bound by Local 152's collective bargaining agreement with Dietz. *Id.* at ¶¶ 6-7. Ms. Mendoza received a copy of the bargaining agreement, which governs wages, rules of conduct, and grounds for discipline and discharge, and the incorporated employee handbook, which was available "on every floor" and upon request. *Id.* at ¶¶ 7-8; 13.

Ms. Mendoza "knew all the rules of Dietz & Watson," but only read "some things" contained in the bargaining agreement, including its provision for the receipt of overtime when an employee works over 40 hours. *Id.* at ¶ 9(a). Nonetheless, Ms. Mendoza knew that the rules prohibited an employee from leaving work during the employee's shift without the permission of a supervisor. *Id.* at ¶¶ 10-11. And Ms. Mendoza does not dispute that the workplace rules prohibit insubordination: for a first offense of insubordination, punishment ranges from a 3-day suspension to discharge, and a second offense results in discharge. *Id.* The employee handbook also describes Dietz's practice as an equal opportunity employer and its prohibition on harassment, discrimination, and retaliation. *Id.* at ¶ 12.

Ms. Mendoza's production supervisors were two men: Paul Blom and Sandor Istvan. *Id.* at ¶ 5. Mr. Blom and Mr. Istvan were responsible for achieving daily food production goals on first shift, overseeing eleven production lines in the slicing department. *Id.* at ¶ 15. Mr. Istvan assigned Ms. Mendoza to work one hour of overtime per day, beginning her shifts at 5:00 AM

instead of the typical first shift start time of 6:00 AM.  *Id.* at ¶ 15.  After that, things went south.

One week after starting her position, Mr. Istvan "spoke poorly" to Ms. Mendoza "in front of

everybody."  DI 20-4 at 110, 39:13-40:20.[2]  Ms. Mendoza was then unwilling to work the

additional overtime hour each day because it was "not fair" to her.  *Id.*

Ms. Mendoza testified that she later "asked him for over time, but he said that I don't

work."  *Id.* at 40:3-4; DI 22-2 at ¶ 17.  According to Mr. Blom, Dietz has historically offered

overtime to employees "based on their attendance during the workweek," which serves as an

indicator of that employee's "reliability."  DI 20-4 at 432 ¶ 5.  Mr. Blom and Mr. Istvan also

gave employees, including but not limited to Ms. Mendoza, instruction and counseling on

spending excessive time in the bathroom, work attendance, leaving the production line to

socialize with other employees, leaving a work station and the plant without notifying a

supervisor of early departure, and refusing work assignments.  DI 2-2 at ¶ 20.

Ms. Mendoza is homosexual.  *Id.* at ¶ 21.  During the course of her employment with

Dietz, Mr. Istvan learned of Ms. Mendoza's sexual orientation, though he does not recall when.

*Id.* at ¶ 25.  Mr. Istvan was also aware that Ms. Mendoza's significant other, who was and is still

employed by Dietz, is homosexual.  *Id.*  Mr. Istvan never referred to Ms. Mendoza by any "anti-

gay slur," but Ms. Mendoza alleges that she was "regularly singled out" because of her sexuality.

*Id.* at ¶ 26.  According to Ms. Mendoza, Mr. Istvan: repeatedly reprimanded her for speaking

with female employees; spoke to her in a condescending and critical manner; refused to approve

her vacation requests; disparately monitored bathroom breaks; and made "blatant anti-gay"

---

[2] When citing to deposition testimony we cite to the page number according to the PDF numbering system, followed by the specific page number and lines in the deposition transcript.

comments such as stating his disapproval of homosexuality in the workplace. *Id.* at ¶¶ 26, 36.

In August of 2022, Ms. Mendoza was asked to meet privately with Dietz's Human Resources Manager Donna Gormley because Ms. Mendoza was a "no call no show" at work the prior day. *Id.* at ¶¶ 39-40. Ms. Gormley took handwritten notes during that conversation. DI 20-4 at 58. Ms. Gormley's notes document Ms. Mendoza's mention of: not receiving a raise in her six years there; Mr. Istvan's lack of respect for women; that Mr. Istvan not saying anything to the "temps" regarding their performance; requests for overtime "[f]or years"; and the fact Mr. Istvan will see men "doing nothing" and "yell at [Ms. Mendoza] to go do something." *Id.* at 58-60. Ms. Gormley's notes then seem to document a separate conversation with Mr. Istvan about Ms. Mendoza. *Id.* at 60. According to the notes, Mr. Istvan stated he "[did] not treat her any different," that Ms. Mendoza would "stand around and socialize" and "does not like to be corrected," and that Ms. Mendoza was not receiving overtime because she was "not productive." *Id.*

On November 7, 2022, Ms. Mendoza met with Human Resources Manager Coleen Brzozowski. *Id.* at ¶ 55; DI 20-4 at 182. During that conversation, Ms. Mendoza complained of a lack of overtime work opportunities and Mr. Istvan's use of the phrase "hey guys" when requesting to speak to employees including Ms. Mendoza. *Id.* Ms. Brzozowski conveyed her conversation to Ms. Gormley. *Id.* Ms. Gormley followed up with Mr. Istvan, who informed Ms. Gormley that he uses the phrase "hey guys" colloquially. DI 22-2 at ¶ 62; DI 20-4 at 433. Nonetheless, Ms. Gormley required Mr. Istvan to take an online course on sexual harassment training. DI 22-2 at ¶ 62.

On January 27, 2023, Ms. Mendoza requested to leave work early upon discovering that

her partner's father died. *Id.* at ¶ 26. Her request was approved, but Ms. Mendoza says she was "repeatedly berated" for leaving early upon her return to work on January 30, 2023 and until her termination on February 1, 2023. *Id.* On February 1, Ms. Mendoza was instructed to move to a different production line after the line she was working on became inoperable. *Id.* at ¶ 78. All employees that were working on Ms. Mendoza's production line then switched lines as instructed. *Id.* at ¶¶ 79-80. But Ms. Mendoza did not. Instead, she began another task, and as a result Mr. Istvan berated her and ordered her to go to the line, which she eventually did. *Id.* at ¶¶ 26, 87. Mr. Istvan told Ms. Mendoza in Spanish that "[i]t's my house, not your house" in reference to the workplace. *Id.* at ¶ 32. At his deposition, Mr. Istvan testified that what he meant was that "[s]ometimes people can be sloppy, and we work in a very clean environment. It's not acceptable for food safety." *Id.* As Ms. Mendoza recalls it, Mr. Istvan used that expression to disapprove of homosexuality in the workplace. *Id.* at ¶ 32.

Following an interview of Ms. Mendoza in the presence of a union representative, Ms. Gormley concluded that Ms. Mendoza violated Dietz's rules against insubordination. *Id.* at ¶ 91. Ms. Gormley then recommended Ms. Mendoza's termination to plant manager Wes Mazur, who agreed with Ms. Gormley's recommendation. *Id.* at ¶¶ 93-94; DI 20-4 at 18, 50:16-51:7. Ms. Mendoza was then fired on February 1, 2023 for insubordination. *Id.*

Damarys Guzman, a woman who is married to a man, made similar complaints about Mr. Istvan to Ms. Gormley. *Id.* at ¶ 36; DI 20-4 at 13, 31:8-32:11. Ms. Guzman complained that she felt disrespected by the way Mr. Istvan spoke to her, monitored her bathroom usage, and denied her requests for time off. *Id.* Ms. Guzman also complained to Ms. Gormley about a lack of overtime hours. DI 22-2 at ¶ 54. In 2022, Dietz also discharged two production employees for

leaving the premises during their shifts without obtaining permission from a supervisor: one who left after being told not to, and another who regularly left at least an hour early each day. *Id.* at ¶ 73. And between 2022 and 2023, Ms. Gormley discharged five male production employees for violation of Dietz's rule against insubordination. *Id.* at ¶ 95.

## II.    Procedural History

Ms. Mendoza dual filed a charge of discrimination with the Equal Opportunity Employment Commission (EEOC) and the Pennsylvania Human Relations Commission (PHRC) on March 31, 2023. *Id.* at ¶¶ 111, 114; DI 22-4. The EEOC issued Ms. Mendoza a right-to-sue letter upon request on March 11, 2024. DI 22-2 at ¶ 115. On June 10, 2024 Ms. Mendoza brought her complaint here. DI 1. She brings claims for: (1) sexual-orientation discrimination/hostile work environment under Title VII of the Civil Rights Act of 1964 (Title VII); (2) sexual-orientation discrimination/hostile work environment under the Pennsylvania Human Relations Act (PHRA); (3) retaliation under Title VII; and (4) retaliation under the PHRA. *Id.* at ¶¶ 42-75. Dietz now moves for summary judgment on all of Ms. Mendoza's claims. DI 20-2, 22-1, 23, 25.

## III.    Standard of Review

Survival of summary judgment requires a plaintiff to "point to concrete evidence in the record that supports each and every essential element of [her] case." *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (citation modified). And "[a]lthough we view all the facts in the light most favorable to a plaintiff opposing summary judgment and draw all reasonable inferences in that party's favor, a plaintiff who reaches the summary judgment stage may no longer rest upon the mere allegations or denials of [her] pleadings." *Id.* "Bare assertions,

6

conclusory allegations, or suspicions" are similarly insufficient at this stage. *Id*. (citation modified). With this in mind, we will grant summary judgment if Dietz shows that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## IV.    Discussion

Dietz argues that it is entitled to summary judgment for three main reasons. First, because Ms. Mendoza failed to exhaust her administrative remedies. DI 20-2 at 1. Second, because Ms. Mendoza does not adduce sufficient evidence to support her hostile work environment claims. *Id.* And third, because the evidence adduced in discovery does not demonstrate that Ms. Mendoza engaged in any protected activity and otherwise lacks a causal connection between any protected activity and her discharge from Dietz. *Id.* We disagree with Dietz that Ms. Mendoza did not exhaust her administrative remedies. But because the available evidence is insufficient to create a genuine dispute as to each element of Ms. Mendoza's claims, we grant the motion for summary judgment.[3]

### A.  Ms. Mendoza exhausted her administrative remedies

Ms. Mendoza properly exhausted her administrative remedies. Dietz argues that Ms. Mendoza failed to exhaust her administrative remedies under the Pennsylvania Human Relations Act (PHRA) because Ms. Mendoza's counsel — as opposed to Ms. Mendoza herself — completed the form by which Ms. Mendoza requested the EEOC to dual-file her Charge of

---

[3] We analyze Ms. Mendoza's state law claims in conjunction with their federal analogs. *Bennett v. Southeastern Pennsylvania Transportation Authority*, 2025 WL 128815, at *2 n.2 (3d Cir. April 30, 2025) (Chagares, C.J.) ("Courts 'generally interpret the PHRA in accord with its federal counterparts.'") (quoting *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

Discrimination with the Pennsylvania Human Rights Commission.  DI 20-2 at 3-5.  Under Pennsylvania statute, says Dietz, Ms. Mendoza was required to personally verify the accuracy of the factual statements alleged in her EEOC charge.  *See id*. (citing 58 Pa. Code § 495a.5).  And even if Ms. Mendoza did sufficiently dual file with the EEOC and PHRA, Dietz argues that since there is no evidence that PHRC investigated Ms. Mendoza's claim or authorized her to file suit, her PHRA claims should be dismissed.  DI 20-2 at 4-5.

We disagree.  First, "[t]he EEOC defines a 'charge' as a 'statement filed with the Commission by *or on behalf of an aggrieved person* which alleges that the named prospective defendant has engaged in or is about to engage in actions in violation of the ADEA or Title VII.'"  *Pizio v. HTMT Glob. Sols.*, 555 F. App'x 169, 173 (3d Cir. 2014) (citation modified).  The Third Circuit has explained that when filing with the EEOC, "[f]ormality is not essential" and there is no requirement of "some magic combination of words[.]"  *Id.*  That reasoning applies with equal force here.  It would make little sense to dispose of a plaintiff's claims for failure to dual file with a state agency because an attorney, whose duty is to faithfully represent the interests of his client, signed the dual filing form on her behalf.

Second, Ms. Mendoza's EEOC charge is signed by her.  DI 14-1 at 3.  The bottom of the page containing Ms. Mendoza's signature provides: "I want this charge filed with both the EEOC and the State or local agency, if any."  *Id.*  And third, the form signed by her experienced counsel similarly provides that "[y]ou have chosen EEOC to investigate your complaint, so PHRC *will not investigate it* and, in most cases, will accept EEOC's finding."  *Id.* at 4 (emphasis added).  So not only are we satisfied that Ms. Mendoza's signature (and her counsel's signature on her behalf) meet the dual filing requirements, but we also conclude that there was no need for

8

Ms. Mendoza to wait until PHRC formally concluded any investigation or informed her of a right to sue under the PHRA.

Where a party files with the PHRC, the agency "has exclusive jurisdiction over the claim for a period of one year in order to investigate and, if possible, conciliate the matter." *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 471 (3d Cir. 2001) (citation omitted). But "[i]mportantly, and unlike under Title VII, notice of the right to sue is not required in order to bring the PHRA action . . . after one year has elapsed, a complainant may bring a court action regardless of whether or not he has received a letter from the PHRC." *Id.* Ms. Mendoza's charge letter was filed with the EEOC on March 31, 2023, and the complaint was not filed until June 10, 2024 — over a year later. Ms. Mendoza had a right to bring her PHRA claims here after the PHRC did not issue a right to sue letter within one year of her dual filing with the EEOC and PHRC.[4]

### B. Ms. Mendoza's sexual-orientation discrimination claims under Title VII and the PHRA will be dismissed

In the absence of direct evidence, a claim for sexual-orientation discrimination under Title VII — and by extension the PHRA — is analyzed under the familiar burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 92, 802-803 (1973). Under that framework, Ms. Mendoza must first show "a *prima facie* case" of discrimination. *Xu*

---

[4] The authority Dietz cites in support is inapposite because it involves instances where the plaintiff waited less than a year to file after getting a right to sue letter from the EEOC, cutting the PHRC's one-year exclusivity short. *See* DI 20-2 at 4-5 (citing *O'Brien v. The Middle East Forum, et al.*, No. 2:19-cv-06078 (E.D. Pa. 2021)). That is not the case here. See *Parker v. Buttonwood Painting Contractors, Inc.*,2020 WL 3050569, at *13 (E.D. Pa. June 8, 2020) (Marston, J.) (rejecting argument that claims under PHRA were precluded for lack of a right to sue letter from PHRC).

*Feng v. University of Delaware*, 785 F. App'x 54, 55 (3d Cir. 2019); *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022). If Ms. Mendoza can do so, then Dietz must "give a 'legitimate, nondiscriminatory' reason for its actions." *Id.* The burden then shifts back to Ms. Mendoza to show the reason offered by Dietz is pretextual. *Id.*

    1. <u>*Ms. Mendoza cannot show a prima facie case of sexual-orientation discrimination*</u>

Ms. Mendoza cannot show a *prima facie* case of sexual-orientation discrimination. To satisfy step one of the *McDonnell Douglas* framework, Ms. Mendoza must show that: (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) there are circumstances supporting an inference of discrimination. *Fennell v. Comcast Cable Communications Management, LLC*, 628 F. Sup. 3d 554, 571 (E.D. Pa. 2022) (Baylson, J.). Dietz assumes that Ms. Mendoza can show she is a member of a protected class and that she was qualified for her position. DI 20-2 at 8. Instead, Dietz argues that Ms. Mendoza has not suffered an adverse employment action and cannot show that the circumstances here give rise to an inference of intentional discrimination. *Id.* So, we confine our analysis to those elements. *Fennell*, 628 F. Supp. 3d at 571.

Termination is a textbook adverse employment action. *Walker v. Centocor Ortho Biotech, Inc.*, 558 F. App'x 216, 219 (3d Cir. 2014) ("Termination, failure to promote, and failure to hire all constitute adverse job actions."); *Aguiar v. Morgan Corp.*, 27 F. App'x 110, 112 (3d Cir. 2002) (holding plaintiff suffered an adverse employment action because "[a]lthough the actual date and cause of termination is in dispute, both parties agree Aguiar was fired from his position of production employee at Morgan Corporation in July 1997."). Dietz's argument that Ms. Mendoza did not suffer an adverse employment action despite acknowledging that Ms.

10

Mendoza was terminated is therefore confusing.  DI 20-2 at 8.  Ms. Mendoza satisfies that element of her *prima facie* case.

An inference of intentional discrimination may be established "in a number of ways." *Fennell*, 628 F. Supp. 3d at 572 (citing *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (quotations omitted)).  That includes evidence of similar discrimination against other employees, more favorable treatment of a similarly situated employee outside the class, or statements by a supervisor indicating discriminatory animus.  *Id.* (citation modified).  At the outset, Ms. Mendoza argues that Mr. Istvan had not requested discipline for Ms. Mendoza prior to her termination, knew she was homosexual, and treated others outside of her protected class differently by requesting discipline.  DI 22-1 at 8.  In support, she cites to two paragraphs from her response to Dietz's statement of undisputed material facts, and more vaguely to her "sworn interrogatory responses which detail [Mr. Istvan's] discriminatory comments and treatment of Plaintiff compared to others."  *Id.*

The first of the two paragraphs cited by Ms. Mendoza establish only that Mr. Istvan knew Ms. Mendoza was homosexual.  DI 22-2 at ¶¶ 25.  And the second mischaracterizes Mr. Istvan's testimony.  Rather than showing that "Mr. Istvan treated others outside of [Ms. Mendoza's] protected class differently," DI 22-1 at 8, Mr. Istvan testified that he never requested Ms. Mendoza be given a written warning for refusing to do a job, and confirmed that he never requested a written warning for any other employees with whom he experienced the same issue.  DI 20-4 at 79, 26:2-27:6.  That Ms. Mendoza acknowledged as much yet still concluded that Ms. Mendoza was treated differently than those outside of her protected class when Mr. Istvan requested discipline strains credibility.

11

This insufficiency is compounded by Ms. Mendoza's vague reference to her answers to Dietz's interrogatories. As the Third Circuit has explained, "District Courts are not required to search through the record for evidence to support a party's assertion of the existence of a genuine issue of material fact." *Id.*; Fed. R. Civ. Pro. 56(c)(1)(3) ("The court need consider only the cited materials[.]").[5] A general reference to "sworn interrogatory responses" without citation falls well short of the "concrete evidence in the record" required for "each and every essential element of her case." *Nitkin*, 67 F.4th at 571. But as we explain below, even if Ms. Mendoza's interrogatory responses had been properly cited to, they do not create the inference of sexual-orientation discrimination.

Ms. Mendoza dedicates the remainder of her argument regarding her sexual-orientation discrimination claims to arguing that any comparators identified by Dietz are for a jury to evaluate. DI 22-1 at 8-10. To be clear, "[w]hether a comparator is truly similarly-situated to a plaintiff is an issue of law." *Moore v. Shinseki,* 487 Fed.Appx. 697, 698 (3d Cir.2012) (citation modified). But regardless, focusing on Dietz's purported comparators in the absence of Ms. Mendoza's own evidence of intentional discrimination on the basis of sexual orientation puts the cart before the horse. This step of the *McDonnell Douglas* framework places the burden on Ms. Mendoza, not Dietz, to establish a *prima facie* case of discrimination. *Xu Feng*, 785 F. App'x at 55. We conclude Ms. Mendoza is unable to do so. Even assuming Ms. Mendoza can establish a *prima facie* case of sexual-orientation discrimination, though, she cannot show that Dietz's proffered nondiscriminatory reason is pretext.

---

[5] Put more creatively, "Judges are not like pigs, hunting for truffles buried in the record." *Estate of Egenious Coles v. Zucker, Goldberg, & Ackerman*, 658 F. App'x 108, 111 (3d Cir. 2016).

2. *Dietz offers a legitimate, nondiscriminatory reason for Ms. Mendoza's termination*

Just as termination is a classic example of an adverse employment action, insubordination is a well-established legitimate, nondiscriminatory reason to terminate an employee. *Bisbing v. Lehighton Ambulance Ass'n, Inc.*, 142 F. App'x 71, 73-74 (3d Cir. 2005) (clear evidence that plaintiff was "insubordinate to [her] superiors . . . is a sufficient, legitimate reason for termination."); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (burden of offering legitimate, nondiscriminatory reason for discharge was "easily met . . . by introducing evidence that plaintiff was fired for his insubordination in twice refusing to immediately remove his headset radio when so directed."); *Harris v. Vitran Express, Inc.*, 2016 WL 1255296, at *6 (W.D. Pa. Mach 31, 2016) (collecting cases). Ms. Mendoza admitted during her deposition that she "knew all the rules of Dietz and Watson," which provide that a first offense of insubordination may result in termination. DI 22-2 at ¶ 19. And on February 1, 2023, Mr. Istvan asked Ms. Mendoza to switch production lines and go to line 5. *Id.* at ¶ 79. All employees working Ms. Mendoza's same production line switched lines as directed, except for Ms. Mendoza, who went to line 10. *Id.* at ¶ 80-81. Ms. Mendoza was then directed a second time by Mr. Istvan to report to line 5. *Id.* at ¶ 82. Thus, Dietz has met its burden of offering a legitimate, nondiscriminatory reason for terminating Ms. Mendoza.[6]

3. *Ms. Mendoza cannot show that Dietz's legitimate, nondiscriminatory reason was pretextual*

At the pretext stage of the *McDonnell Douglas* framework, Ms. Mendoza "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is

---

[6] We need not make any credibility determinations reserved for a fact finder in order to decide that Ms. Mendoza was insubordinate because her own admissions suffice. *See* DI 22-2 at ¶¶ 19, 79-81

13

whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).  Rather, Ms. Mendoza must do one of two things.  First, she may "present sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon" Dietz's reasons for terminating her "by painting them as weak, implausible, contradictory, or incoherent[.]" *Id.* Second, she may "come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of" her termination, for example by showing that Dietz "had subjected [her] to unlawful discriminatory treatment . . . treated other similarly situated persons not of [her] protected class more favorably, or . . . discriminated against other" homosexual employees.  *Id.*

Ms. Mendoza does not do either.  Her opposition to Dietz's motion for summary judgment argues that "[t]he same evidence which demonstrates circumstances giving rise to an inference of discrimination would also allow a factfinder to conclude that Defendant's stated reason for its adverse actions were pretext."  DI 22-2 at 9 (citing *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 262 (3d Cir. 2017).[7]  While we agree that may be true in some circumstances, it is not the case here.  For the reasons explained above, the evidence cited in support of Ms. Mendoza's *prima facie* claim of sexual-orientation discrimination was inadequate.  Assuming it were sufficient at the *prima facie* stage, it would not be so at the pretext

_____

[7] We also note that much of Ms. Mendoza's summary judgment briefing seems to conflate the sexual-orientation discrimination and retaliation analyses by citing interchangeably to case law addressing discrimination and retaliation claims.  *See* DI 22-1 at 5-14.  We do not take such an intermingled approach.  See *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (noting, in light of Supreme Court precedent, that "the discrimination and retaliation provisions of Title VII have different statutory language and different purposes," and as such, those claims have similar yet different analyses).

stage.  *Simpson v. Kay Jewlers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998) (An inference of discrimination based on cherry-picked comparator evidence "may be acceptable at the prima facie stage of the analysis" because there "the inquiry is based on a few generalized factors."  That is "not necessarily" the case "at the pretext stage where the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity.").

Further, we find unpersuasive Ms. Mendoza's argument that she was treated differently than coworkers outside her protected class because Mr. Istvan requested discipline for her insubordination.  DI 22-1 at 8.  In *Simpson v. Kay Jewlers*, the Third Circuit agreed with the reasoning of a Seventh Circuit decision explaining that "a black plaintiff cannot establish racial discrimination by singling out one white person who was treated more favorably when there were other white persons who were treated less favorably than other black persons."  142 F.3d at 646.  Third Circuit explained that "to hold otherwise would be to permit the inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably."  *Id*.  That reasoning applies equally here.

We are similarly unpersuaded by Ms. Mendoza's self-serving interrogatory responses. See *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) ("conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.") (citation modified); see also *Parker v. School District of Philadelphia*, 415 F. Supp. 3d 544, 566-67 (noting same and concluding that employment discrimination plaintiff "has not proffered sufficient evidence to rebut defendants' legitimate reason for removing plaintiff[.]").

For example, Dietz's interrogatory #2 requests that Ms. Mendoza "set forth with particularity and detail each and every act of alleged sexual-orientation discrimination against Plaintiff in connection with plaintiff's employment," including the date and time they occurred, the type of discrimination, the manner of discrimination, the individual who discriminated against her, any action taken in response by Ms. Mendoza, and any response by Dietz.  DI 20-4 at 132.

Ms. Mendoza responded with general allegations of discrimination:

> Plaintiff was regularly singled out by Sandor . . . as soon as, to Plaintiff's knowledge and belief, Sandor discovered that Plaintiff was gay. Sandor repeatedly reprimanded Plaintiff for speaking with female employees, often spoke to her in a condescending and critical manner, refused to approve Plaintiff's vacation requests, and made blatant anti-gay comments including, *inter alia*, stating his disapproval of homosexuality at the company because "it is my house" or words to that effect.

*Id.*  Ms. Mendoza then identifies three purported occasions on which she says she was discriminated against: (1) between January 27, 2023 when she left work early and February 1, 2023, when she was terminated, Mr. Istvan "repeatedly berated her for leaving early on January 27"; (2) On February 1, 2023, Mr. Istvan instructed Ms. Mendoza to move to work on a different line, and subsequently "berated her and ordered her to go to the line" when she began a task other than the one she was directed to do; and (3) on February 1, 2023, Ms. Gormley terminated Ms. Mendoza for insubordination unrelated to her leaving work early on January 27, 2023, but stated that Ms. Mendoza's leaving work early would have been permitted if it was her husband rather than her female partner.  *Id.*

None of these interrogatory responses cast doubt on Dietz's legitimate, nondiscriminatory reason for Ms. Mendoza's termination.  Ms. Mendoza's general allegations of discrimination are insufficient here because they are the kind of "bare assertions, conclusory allegations, or suspicions" that the Third Circuit has said is insufficient to survive summary judgment.  *Nitkin*,

16

67 F.4th at 571 (citation modified). Ms. Mendoza cannot "rely merely on vague statements to defeat summary judgment," and we will not indulge her "general, unsubstantiated allegations that the alleged conduct occurred 'regularly' or 'all the time.'" *Id.* (citation modified); *Coley v. New Jersey Transit Corporation*, 2022 WL 5240385, at *4 (3d Cir. Oct. 6, 2022) (none of plaintiff's general claims that African Americans were treated "differently in terms of attendance occurrences, breaks, overtime, smoking, and promotional exams" were sufficient for a fact finder to reasonably conclude plaintiff's race was "more likely than not" a determinative cause of the recommendation of plaintiff's termination).

That leaves us with Ms. Mendoza's three specific examples. Viewing those examples in the light most favorable to Ms. Mendoza, we conclude they too are insufficient to show Dietz's reason for terminating her was pretextual. First, Mr. Istvan's repeated berating Ms. Mendoza for leaving work early on January 27, 2023 does not raise the inference of sexual-orientation discrimination, let alone cast doubt on Dietz's legitimate, nondiscriminatory reason for terminating her. Even if Ms. Mendoza had gotten permission to leave early as she contends, DI 20-4 at 132, it might suggest that Mr. Istvan's actions were unwise, imprudent, shrewd, or incompetent — but it does not show any discriminatory animus on the part of Dietz. *Fuentes*, 32 F.3d at 765; *Coley*, 2022 WL 5240385, at *4. Second, that Mr. Istvan allegedly berated Ms. Mendoza for disobeying the order to switch production lines does little more than affirm the reason for Ms. Mendoza's termination: that she violated the rule against insubordination despite Mr. Blom and Mr. Istvan's cautioning her not to do so. DI 22-2 at ¶ 20. Third, Ms. Mendoza's own interrogatory responses acknowledge that when she asked whether she was being terminated for leaving work early on January 27, 2023 or for her insubordination on February 1, 2023, Ms.

17

Gormley informed her that it was for insubordination. DI 20-4 at 132. Aside from Ms. Gormley's comment, which is itself unclear, there is no evidence that some ulterior reason was behind Ms. Mendoza's termination.

Finally, there is no evidence that would suggest any purported discriminatory animus by Ms. Gormley was relayed to and relied upon by the plant manager, Wes Mazur, who ultimately agreed with Ms. Gormley's recommendation of Ms. Mendoza's termination.[8] DI 22-2 at ¶ 93; *Fuentes*, 32 F.3d at 766-67 (explaining that in this context, "the question is whether" the relevant decisionmaker "believed those criticisms to be accurate and actually relied upon them[.]"); *Coley*, 2022 WL 5240385, at *4 (concluding plaintiff could not show pretext absent any assertion that the relevant decisionmaker had a basis to accept the reports of other employees); *Hooker v. Novo Nordisk Inc.*, 2021 WL 3087786, at *4 (3d Cir. July 22, 2021) (plaintiff failed to establish pretext because he attributed no prejudice or action to the relevant decisionmaker, or that the purportedly biased employees had any influence on the decision to terminate him). We therefore dismiss Ms. Mendoza's claims for sexual-orientation discrimination under Title VII and the PHRA.

### C. Ms. Mendoza's retaliation claims under Title VII and the PHRA will be dismissed

Ms. Mendoza's retaliation claims will be dismissed for reasons largely similar to her sexual-orientation discrimination claims. Because retaliation claims under Title VII are also analyzed under the *McDonnell Douglas* framework, we begin with the elements of a retaliation claim. *Daniels v. School Dist. Of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015). To establish a

---

[8] Indeed, Ms. Mendoza's evidence is even a degree removed because there is no evidence that any discriminatory animus was relied upon by Ms. Gormley, who then made a recommendation to Mr. Mazur.

*prima facie* retaliation claim, plaintiff must show: "(1) that she engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Id.*

Ms. Mendoza easily meets the first two elements. She says she engaged in protected activity on November 7, 2022, when she complained to Ms. Brzozowski that Mr. Istvan used the phrase "hey guys" when communicating with Ms. Mendoza and other production employees, which Ms. Mendoza felt was a reference to her sexual orientation and an attempt to call her a man. DI 22-1 at 14; DI 22-2 at ¶ 58. She was later fired on February 1, 2023. DI 22-2 at ¶¶ 93-94. That is enough to satisfy those two elements. *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (concluding, where plaintiff complained to director about perceived discrimination that "LeBoon clearly suffered a materially adverse action, since she was terminated from her job. She has also proffered evidence that she engaged in activity protected by Title VII [.]"). Ms. Mendoza's ability to make out a *prima facie* case therefore hinges on showing a causal connection between her complaint to Ms. Brzozowski and her termination.

A plaintiff can proffer a "broad array" of evidence to show a causal connection between her protected activity and her termination. *Day v. New Jersey Dep't of Corr.*, 2025 WL 3206676, at *3 (3d Cir. Nov. 17, 2025) (quoting *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017)) (citation modified). That broad array includes "evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity unusually suggestive of retaliatory motive." *Id.*

A reasonable jury cannot draw an inference of retaliation, however, where this is no evidence that the relevant decisionmaker — those responsible for the adverse action — "knew of the plaintiff's protected conduct at the time they acted." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015). In the context of this case, a period of months, rather than days, is insufficient to establish temporal proximity. *Bailey v. Commerce Nat. Ins. Services, Inc.*, 267 F. App'x 167, 170 (3d Cir. 2008) (holding a period of four months between protected activity and termination is not unusually suggestive of retaliatory motive); *Leboon*, 503 F.3d at 233 (period of three months insufficient to raise an inference defeating summary judgment); *Kern v. Das Companies, Inc.*, 2025 WL 2170324, at *9 n.4 (3d Cir. July 31, 2025) (sufficient temporal proximity to infer retaliatory motive "has been understood to mean no more than a handful of days[.]"). And "petty intra-office squabbles" do not amount to a pattern of antagonism. *Martinez v. Rapidigm, Inc.*, 290 F. App'x 521, 526 (3d Cir. 2008).

Ms. Mendoza's *prima facie* case suffers from three fatal deficiencies. First, as explained above, there is no evidence that any discriminatory animus was relayed to or relied upon by Mr. Mazur. There is similarly no evidence that the contents of Ms. Mendoza's November 7, 2022 meeting with Ms. Brzozowski — specifically her complaint about Mr. Istvan's use of the phrase "hey guys" — were known by Mr. Mazur at the time he agreed she should be terminated for insubordination.[9] *Daniels*, 776 F.3d at 196. Second, the time between Ms. Mendoza's

---

[9] Of note, only complaints specifically related to discrimination on the basis of some protected characteristic will constitute protected activity. Personal grievances will not. *Day*, 2025 WL 3206676, at *3 (grievance report that "contained only personal grievances" was not protected activity); *Qin v. Vertex, Inc.*, 100 F.4th 458, 476 (3d Cir. 2024) ("Only complaints about discrimination prohibited by Title VII—discrimination based on race, color, religion, sex, or national origin—constitute protected activity.") (citation modified).

November 7 meeting with Ms. Brzozowski and her termination on February 1, 2023 is too long to create a nexus between her protected activity and her termination. *Bailey*, 267 F. App'x at 170. Third, Ms. Mendoza does not adduce a "pattern of antagonism" which would create the inference of retaliation. Between November 27, 2022 and February 1, 2023 were two incidents: Mr. Istvan's alleged berating Ms. Mendoza for leaving work early on and after January 27, and his berating Ms. Mendoza for not following his directions to switch production lines on February 1. DI 22-2 at ¶¶ 26, 79-80. These are the kind of workplace "squabbles" which fall short of raising an inference of discrimination. *Martinez*, 290 F. App'x at 526 (3d Cir. 2008); *Goodwin v. University of Pennsylvania*, 2023 WL 8027306, at *20 (E.D. Pa. Nov. 20, 2023) (Kearney, J.) ("not all discomfort in the workplace is antagonism."). Ms. Mendoza cannot make a *prima facie* showing of retaliation.

As above, so below: even if Ms. Mendoza could make a *prima facie* of retaliation, summary judgment would still be appropriate. Dietz has provided a legitimate, nondiscriminatory reason for Ms. Mendoza's termination. *See* section II.B.2, *supra*. Similarly, Ms. Mendoza cannot show that reason is pretextual. *Ward v. Ingersoll-Rand Co.*, 688 F. App'x 104, 108-09 (3d Cir. 2017) (termination of employee for returning to work station late not pretextual); *Bright v. LabCorp*, 627 F. App'x 75, 78-79 (3d Cir. 2015) (termination of employee for refusing work assignments after receiving a written warning not pretextual). Ms. Mendoza's retaliation claims are dismissed.

### D. Ms. Mendoza's hostile-work-environment claims under Title VII and the PHRA will be dismissed

To survive summary judgment on her hostile-work-environment claims, Ms. Mendoza must point to concrete evidence in the record that: (1) she suffered intentional discrimination

21

because of her sexuality; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) *respondeat superior* liability. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).[10]  A court assessing a hostile work environment claim must consider the frequency, severity, nature (whether physical or verbal) of the alleged discriminatory conduct, and whether it unreasonably interferes with the employee's performance.[11]  *Nitkin*, 67 F.4th at 570.  The conduct "must be extreme" to support a hostile work environment claim.  *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 88 (1998) (citation modified).  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) are inadequate."  *Id.* (citation modified).

As she does with much of her briefing opposing summary judgment, Ms. Mendoza argues — in conclusory fashion — that her hostile-work-environment claim is adequately supported.  DI 22-1 at 11.  We disagree.  Ms. Mendoza says that she "presents sufficient evidence of an environment hostile to Plaintiff both as a woman and a homosexual woman."  *Id*. But Ms. Mendoza's claims are based on sexual-orientation discrimination, not sex discrimination.  *See generally* DI 1.  And while Ms. Mendoza is correct that courts assessing hostile-work-environment claims must look to the totality of the circumstances, *Nitkin*, 67 F.4th at 570, we do not take that requirement to suggest that a plaintiff may survive summary judgment by pointing to any incident that could involve any of her protected characteristics.

---

[10] Dietz does not contest *respondeat superior* liability, so we do not analyze it here.

[11] Hostile work environment claims are not subject to the *McDonnell Douglas* framework. *Hanafy v. Hill Int'l, Inc.*, 669 F. Supp. 3d 419, 432 (E.D. Pa. 2023) (Beetlestone, C.J.) (citing *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 n.11 (3d Cir. 2017)) (citation modified).

*Angelis v. Philadelphia Housing Authority*, 2024 WL 643142, at *7 (E.D. Pa. Feb. 15, 2024) (dismissing sex discrimination claim where allegations related to the plaintiff's sexual orientation, not sex).[12]

Thus, the only examples Ms. Mendoza says were targeted at her sexual orientation specifically are Mr. Istvan's reference to the workplace as "his house" and saying "hey guys" to Ms. Mendoza and other employees. DI 22-1 at 11 (citing DI 22-2 at ¶¶ 26, 31, 58). Even indulging Ms. Mendoza's version of those events, which Mr. Istvan and Dietz dispute, those comments are not severe or pervasive enough to sustain her claims. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (a statement "which engenders offensive feelings in a employee . . . does not sufficiently affect the conditions of employment to implicate Title VII.") (citation modified); *Nitkin*, 67 F,4.th at 571-72 (same); *Rivera v. Office of Attorney General*, 2024 WL 4771388, at *7 (five examples of allegedly sexist comments and actions made by supervising agent did not reach the "high bar" required for a hostile work environment claim) (Murphy, J.), *aff'd*, 2026 WL 744501 (3d Cir. Jan. 9, 2026). Ms. Mendoza's hostile work environment claims are dismissed.

### E. Conclusion

No reasonable jury could sustain Ms. Mendoza's claims. The evidence identified by Ms. Mendoza — as well as the broader record — is too attenuated, speculative, and unclear to advance the claims Ms. Mendoza has brought. Accordingly, we grant Dietz's motion for summary judgment in its entirety. All of Ms. Mendoza's claims are dismissed.

---

[12] To be clear, the examples of a hostile environment purportedly related to gender are inadequate anyway because they present only general, vague allegations of hostility that don't have a clear nexus to Ms. Mendoza specifically or her gender. DI 22-1 at ¶¶ 35-37, 44, 54.